# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BEVERLY RODRIGUEZ,

       Plaintiff,

v.                                      15cv681 WPL/LF

JEFFREY SMITH,

       Defendant.

## ORDER GRANTING SMITH'S MOTION FOR SUMMARY JUDGMENT

Defendant Jeffrey Smith filed a motion for summary judgment based on qualified immunity. (Doc. 28.) Plaintiff Beverly Rodriguez filed a response (Doc. 37), and Smith filed a reply (Doc. 41). After reviewing the briefs, I issued an order, sua sponte, giving Rodriguez the option to file an amended response because she did not fully comply with the requirements in D.N.M.LR-Civ. 56.1(b). (Doc. 51.) Specifically, Rodriguez did not include an "additional facts" section; instead, she interspersed her facts throughout her response. Rodriguez then filed an amended response (Doc. 55), and Smith filed an amended reply (Doc. 60). Having read and considered the briefing, case record, and relevant law, I grant Smith's motion.

### BACKGROUND

I begin by noting that Rodriguez's amended response does not entirely comply with my order or D.N.M.LR-Civ. 56.1(b). Though Rodriguez includes an additional facts section (*see* Doc. 55 at 5-17), "[e]ach additional fact" is not "lettered" and does not "refer with particularity to those portions of the record upon which [Rodriguez] relies," as required by D.N.M.LR-Civ. 56.1(b). (*See, e.g.*, Doc. 55 at 5 (failing to cite the following fact: "Maria Carmen Gallegos told him that Plaintiff has ramps that were commonly used for portable buildings in her yard").)

Rodriguez also presents facts as arguments. (*See, e.g.*, *id.* at 6 ("Mr. Martin's credibility should have been called into question since he expressed obvious bias against Plaintiff, when he stated that they butted heads while she was his supervisor, she didn't like Indians, and he didn't like Hispanics, which he expressed during his first interview (Exhibit 7 at 25:3-25, 26:24-26, 27:1-23)").) In resolving the motion, I have considered her facts that are followed by record citations—even if the cited facts are actually arguments—and considered her facts without record citations as if they were arguments.

I construe the facts in the light most favorable to Rodriguez as the non-movant, but will not adopt a disputed fact if it is so contradicted by the record that no reasonable jury could believe it. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

Rodriguez began working for the Cuba Independent School District ("CISD") in 2006 as Director of Transportation, assumed the additional title and duties of Director of Operations in 2007, and ultimately resigned in 2010. (First Smith-Rodriguez Interview Tr. 2:11-4:11 (Doc. 55-8 at 1).) Rodriguez had previously retired from a thirty-six year career in law enforcement. (Doc. 69 at 2.)

In December 2011, Smith, an agent with the New Mexico State Police, began investigating "allegations of fraud, embezzlement and larceny" within CISD. (Smith Aff. at 1 (Doc. 29 at 1).) Smith worked with Craig McClure, an Ethics Investigator from the New Mexico Public Education Department, who was already conducting a separate investigation into administrative wrongdoing at CISD. (*Id.*; Smith Dep. 18:12-18:21 (Doc. 55-4 at 1).)

On December 28, 2011, Smith and McClure interviewed Rodriguez about bus contractor fraud within CISD. (Smith Aff. at 2 (Doc. 29 at 2); First Smith-Rodriguez Interview Tr. 2:1-2:8 (Doc. 55-8 at 1).) Smith had previously submitted a 165 page case report to the Attorney General

and District Attorney to prosecute three separate CISD bus contractors for padding their mileage—including contractor Tacho Chavez, Rodriguez's uncle—but neither agency pursued charges. (Smith Dep. 21:16, 60:18-21 (Doc. 55-4 at 2, 3); Tr. of Arrest of Rodriguez 31:6-14, 36:11-13 (Doc. 55-11 at 3, 4).) During the interview, Rodriguez stated that she purchased metal ramps from an auction at CISD, and the ramps were located in her front yard. (Smith Aff. at 2 (Doc. 29 at 2).)

On January 6, 2012, Smith interviewed Garrison Martin, a custodian at CISD. (Smith Aff. at 2 (Doc. 29 at 2); First Smith-Martin Interview Tr. 2:5-2:11 (Doc. 55-1 at 1).) Martin described property owned by CISD that Rodriguez had at her residence (First Smith-Martin Interview Transcript 2:15-3:6 (Doc. 55-1 at 1)), including "[t]he ramps that were purchase[d] for the portables," (*id.* at 3:5-3:6 (*id.*)). The "portables" were movable buildings that CISD used during renovations of all three schools (Smith-Valdez Interview Tr. 7:1-7:19 (Doc. 55-2 at 2)), and the "ramps" were wheelchair-accessible metal platforms that students used to walk up to the elevated portable buildings. (First Smith-Martin Interview Tr. 3:20-3:25 (Doc. 55-1 at 1).) Martin stated that he "witnessed" Rodriguez, "Pat Aragon, her brother," and "some other contractors," on multiple occasions, remove property belonging to CISD from the maintenance yard, including "maybe three to four" ramps, via "[p]ick-up truck and flat beds." (*Id.* at 8:16-8:25, 13:16-17 (*id.* at 2, 3).) Martin added that, when driving south from Cuba toward Albuquerque, "I look over to her house, and [the ramps are] sitting there in the front yard." (*Id.* at 5:9-10 (*id.* at 2).) Smith was not aware that Martin, who is Native American, previously filed a complaint against Rodriguez for racial discrimination. (Smith Aff. at 3 (Doc. 29 at 3); Smith Dep. 104:13-15 (Doc. 55-4 at 7).)

Smith later drove Martin to Rodriguez's house to compare the ramps at the school with the ramps on Rodriguez's property. (Smith Aff. at 2-3 (Doc. 29 at 2-3).) Smith personally "compared the ramps and found them to be completely matching." (*Id.*) In addition, "Martin positively identified the ramps in Plaintiff's yard as school owned property," and stated they "were attached to the pre-school Head Start portable building but they were not used because the level of the buildings did not require use of the ramps." (*Id.*) Martin also stated that "Plaintiff took two ramps from the maintenance yard to her property." (*Id.* at 3 (*id.* at 3).) Smith conceded that the ramps on Rodriguez's property had no unique identifying features. (Smith Dep. 195:23-196:13 (Doc. 55-4 at 18).)

Also on January 6, 2012, Smith and McClure interviewed Carmen Gallegos, who was the secretary for the CISD school board, among other positions. (Smith Aff. at 2 (Doc. 29 at 2).) Gallegos stated that two metal ramps that were used during the high school construction project were in Rodriguez's front yard. (*Id.*)

On January 9, 2012, Smith and McClure interviewed Rodriguez for a second time. (*Id.* at 4 (*id.* at 4).) Rodriguez stated that she "bought one" ramp at an auction in "October of '06" that's "sitting at [her] house right now" and "goes up to the porch." (Second Smith-Rodriguez Interview Tr. 35:21-36:8, 38:22-24 (Doc. 55-13 at 2, 3).) Later in the interview, Rodriguez stated that her father purchased the ramp and she borrowed it when her mother had knee replacement surgery. (*Id.* at 38:1-5 (*id.* at 3).) Rodriguez added that she did not have a receipt for the purchase but would look for it. (*Id.* at 39:2-7 (*id.*).)

On January 12, 2012, Smith interviewed Nayda Valdez, a shipping and receiving worker for CISD. (Smith Aff. at 3 (Doc. 29 at 3).) Valdez stated that there was an auction of school owned property in 2006 or 2007 and most purchasers received receipts. (*Id.*; *see also* Smith-

Valdez Interview Tr. 2:15-3:5 (Doc. 55-2 at 1).) Valdez also added that the School Board maintained records of the auctioned items. (Smith-Valdez Interview Tr. 3:23-4:12 (Doc. 55-2 at 1).) Valdez also stated that Rodriguez said the ramps in the maintenance yard were not for sale, but Valdez later saw the ramps in Rodriguez's front yard. (Smith Aff. at 3 (Doc. 29 at 3).)

On January 17, 2012, Smith sent an email titled "photos of ramps/NMSP Case" to Gerald Pertner, who worked for the New Mexico Public Schools Facilities Authority ("PSFA"). (Doc. 28-7 at 2.) Smith noted that the ramps in the photo attachments "are the exact same ramps that are in the suspect's yard" and asked Pertner for "an approximate value of two (2) of these ramps and [sic] when your ramps and portables were in Cuba." (*Id.*) Smith also asked Pertner if "the ramps in the photos are owned by Cuba Schools and not the PSFA?" (*Id.*) Pertner replied that "[c]osts vary on the ramps from $4,500.00 to $5,000.00" and that "there is a question whether the portables we sent to Roswell had the ramps included." (*Id.*) Pertner stated that he would check to see whether the ramps arrived in Roswell. (*Id.*) After Smith sent a follow-up email, Pertner responded on February 15, 2012, and wrote that "I've found out today through our regional manager in Roswell that they did not receive ramps with the portables, so these two ramps could possibly belong to PSFA." (*Id.* at 3.) The exhibit to Smith's motion that contains this email exchange does not include the two sets of referenced photos. (*See* Doc. 28-7.)

Smith noted in his deposition that the ramps in Rodriguez's yard were "older, or more weathered" (Smith Dep. 131:12-14 (Doc. 55-4 at 12)), and he understood that the statute of limitations for the New Mexico larceny statute, NMSA 30-16-1 (1978), depends on the classification of the crime, which varies based on the value of the stolen item, which is determined by the item's fair market value at the time of the theft. (Smith Dep. 131:19-135:4 (Doc. 55-4 at 12-13).)

On January 18, 2012, Smith and McClure interviewed Donna Lovato, a secretary at CISD. (Smith Aff. at 4 (Doc. 29 at 4).) Lovato stated that her husband asked Rodriguez at a school auction whether the ramps were for sale. (*Id.*) Rodriguez replied that the ramps were assigned to the portables buildings and not for sale. (*Id.*) Lovato added that she later saw the ramps in Rodriguez's front yard. (*Id.*)

Also on January 18, 2012, Smith and McClure interviewed Veronica Casaus, Transportation Director for CISD. (*Id.* at 5 (*id.* at 5).) Casaus stated that CISD held an auction sometime in 2006 or 2007, and Rodriguez told her that the ramps were not for sale. (*Id.*) She added that two weeks after the auction, she saw the ramps in Rodriguez's yard. (*Id.*) Smith had previous dealings with Casaus: he obtained a search warrant on December 27, 2011, for loan documents related to the fraudulent sale of school busses that Casaus facilitated. (*See* Doc. 55-15 at 4-6.)

Smith prepared an affidavit for an arrest warrant for Rodriguez, which Smith swore before Magistrate Judge Zanotti on August 7, 2012. (*See* Doc. 28-1 at 9.) Deputy District Attorney Cheryl Johnston approved the affidavit the previous week. (*See id.*) Magistrate Judge Zanotti signed the arrest warrant on August 7, 2012. (*See id.*; *see also* Doc. 28-5.)

Also on August 7, 2012, Magistrate Judge Zanotti signed a criminal complaint that Smith prepared charging Rodriguez with "Larceny (between $2500.00 and $20,000.00)" "contrary to Section(s) 30-16-1 (E) NMSA(1978), as amended." (Doc. 28-6 at 1.)

On August 20, 2012, Pertner emailed Smith and noted that "[a]ll ramps are positioned by forklift on site. I would think these two ramps would be too heavy for men to carry." (Doc. 55-6 at 34.) Smith responded the next day, on August 21, 2012, stating that he "will be arresting the

suspect who stole the two (2) ramps from the Cuba Schools soon. That is why I need the information that I requested to determine the owner of the ramps, Cuba Schools or PSFA." (*Id.*)

Also on August 21, 2012, Smith swore an affidavit for a search warrant before New Mexico District Judge Brett Lovelace. (Doc 28-2 at 9.) Deputy District Attorney Cheryl Johnston approved the affidavit the prior day. (*See id.*) The affidavit described the place to be searched as all structures, containers, and parts of Rodriguez's property. (*See id.* at 1.) The items to be seized were "[t]wo (2) tan color metal ramps . . . currently in the front yard" and "[d]ocument(s) that establish or tend to establish ownership, possession, use, transfer, and/or the right to ownership, possession, use and/or transfer" of the ramps. (*Id.*) The search warrant affidavit contains a handwritten addition—the words "and 2006"—written and initialed by Smith, that alters the following otherwise identical sentence that appears in the arrest warrant affidavit: "It should be noted that investigator McClure asked the employees at the Cuba Independent Schools' business office via an email if there were any records of an auction in 2007 and 2006 and they stated there were no records." (*Compare id.* at 6 *with* Doc. 28-1 at 8.)

Also on August 21, 2012, Judge Lovelace signed and issued the search warrant. (Doc. 28-4 at 1.)

On August 24, 2012, after obtaining the warrants but before serving them, Smith contacted the New Mexico Office of the State Auditor, who informed him that they had no proof that Rodriguez purchased the ramps in 2006 or 2007. (Smith Dep. 120:12-19 (Doc. 28-3 at 11).)

On August 27, 2012, the state police served the warrants. (Smith Aff. at 7 (Doc. 29 at 7).) Smith and another state police agent drove to Rodriguez's house, asked her to come out of the house, and told her that "we've got a warrant for your arrest." (Tr. of Arrest of Rodriguez 3:3-4 (Doc. 55-11 at 1).) Smith, without giving Miranda warnings but clarifying that "I'm not asking

questions" (*id.* at 25:18-19 (*id.* at 2)), then discussed the case at length with Rodriguez and her husband, Jesus Rodriguez (*see generally* Tr. of Arrest of Rodriguez (Doc. 55-11)). Smith told Rodriguez that "[t]he district attorney isn't after you. They've got bigger fish than you. And I already talked to them, and they told me if you want to help yourself with these charges you need to start giving details about the padding of the mileage by the three contractors. That's what this is all about." (*Id.* at 25:20-25 (*id.* at 2).) Smith discussed the contractor fraud case and stated that the "Attorney General's Office . . . [t]hey're dragging their feet...[and] now the DA's office, they're like, well, you know, kind of dragging their feet." (*Id.* at 31:6-14 (*id.* at 3).)

Smith then talked with Jesus Rodriguez. (*Id.* at 36:3-39:23 (*id.* at 4-5).) Smith stated that "the district attorney's office is not after her. They're after the bigger fish. And the bigger fish are the bus contractors, including her uncle, that were padding the mileage to the amount of $300,000 over the last five years." (*Id.* at 36:9-13 (*id.* at 4).) Smith also stated that "maybe she don't [sic] want to help now because she's loyal to her uncle . . . [b]ut . . . you guys need to talk in the next couple days, if she's willing to go down for a felony for these guys." (*Id.* at 37:16-20 (*id.* at 5).)

To remove the ramps, Smith arranged for the Department of Transportation to bring a "converted front-end loader with the arm things to lift it up on a flatbed." (*Id.* at 25:14-17 (*id.* at 2).)

On August 28, 2012, the day after Smith served the warrants, the school informed him that an auction occurred in 2006. (Smith Dep. 139:16-140:2 (Doc. 55-4 at 14).)

On September 25, 2012, the Assistant District Attorney vacated the preliminary hearing and informed the judge that he would seek an indictment from a grand jury. (Smith Aff. at 7 (Doc. 29 at 7).)

8

On January 15, 2013, Smith conducted a second interview with Martin. (Second Smith-Martin Interview Tr. 1:11-14 (Doc. 55-12 at 1).) Smith told Martin that "the reason why I'm calling is because this Andrew Miranda, I guess an ex-employee there, filled out an affidavit swearing that he was there the day of the auction, [and] he actually physically witnessed Ms. Rodriguez purchase these ramps," and Rodriguez "actually showed [Miranda] a receipt right up against his face." (*Id.* at 3:1-7 (*id.*).) Martin replied that "Andy Miranda had the truck, and he had one [ramp] in the back of his truck, too." (*Id.* at 3:19-20 (*id.*).) Martin later reiterated that he "did see [the ramp] in Andy's truck." (*Id.* at 6:24-25 (*id.* at 2).) Smith acknowledged the Miranda affidavit but told Martin that Rodriguez "has no proof otherwise. She never produced a receipt. And the school system there, I checked, has no proof that the ramps were ever for sale." (*Id.* at 7:9-12 (*id.*).)

On January 25, 2013, the school district gave Smith the pertinent records from the auction, i.e., a check written by Jesus Rodriguez for $67 made out to "Cuba Schools" with a "For" line that reads "Auction [illegible]," and an auction receipt for Beverly Rodriguez for $67 that lists the purchased items as "Roper Kitchen Stove, Door, (2) Drill Press." (Smith Dep. 116:12-20 (Doc. 55-4 at 9); Doc. 28-9.)

On January 31, 2013, Smith testified before the grand jury. (*See* Smith Grand Jury Testimony Tr. (Doc. 56).) Smith testified that Rodriguez provided inconsistent statements about how she obtained the ramps: initially, she said that she purchased the ramp in her yard at an auction in 2006, but later stated she was borrowing the ramp from her father. (*Id.* at 57:23-58:23 (*id.* at 15).) Smith added that "[c]onsistency in the interview in their story is very important for the credibility of a potential suspect. When someone changes their story[] that raises a flag with

investigators . . . ." (*Id.* at 59:4-6 (*id.*).) Smith also stated that Rodriguez "didn't give me any –
any other leads to back up her story, nothing like that." (*Id.* at 60: 21-22 (*id.*).)

Smith discussed how he tried to obtain the auction records from the school. He noted that
in "January 2012[,]" "the business manager at the time" who "should have all the records" told
him that there was no record that the ramps were sold at an auction. (*Id.* at 30:23-31:7 (*id.* at 8).)
He stated that he kept trying to obtain the records and that Vicki Smith emailed him and said
"[t]here was an auction in late October 2006, but they do not have any records of what was sold,
no inventory." (*Id.* 32:3-5 (*id.*).) He then stated that he "didn't give up yet though. Here we are in
January 2013, just to make sure nothing's changed, I e-mail her again." (*Id.* at 32:16-17 (*id.*).)
"[N]ow all of a sudden, they find some receipt and some bank records and checks related to what
was sold at this auction. So the e-mail to me, of course, I give to the prosecutor. It's part of my
new report, the supplement I did.' (*Id.* at 32:25-33:1-5 (*id.* at 8-9).) Smith later noted that when
reviewing records from the auction he "found no receipts for ramps or anything even close to
ramps, like if someone wants to tell you it's scrap metal, no scrap metal was sold according to
the records that I can see." (*Id.* at 48:25-49:1-3 (*id.* at 12-13).)

Smith also talked about his interviews with Martin. He stated that Martin told him during
their first interview that Martin "actually saw [Rodriguez] take the ramps along with the
assistance of another person in a pickup truck and drive southbound towards her residence." (*Id.*
at 19:14-17 (*id.* at 5).) Smith clarified that Martin stated he saw Rodriguez remove "three or
four" ramps. (*Id.* 78:9-10 (*id.* at 20).) Smith added that he conducted a follow-up interview with
Martin a few weeks before the grand jury convened and Martin stated that Rodriguez had the
help of "Mr. Miranda." (*Id.* at 78:9-15 (*id.*).) Smith later told the grand jury that "no one changed

their story. The only thing is specifically[:] Garrison Martin couldn't give me the exact year." (*Id.* at 107:14-16 (*id.* at 27).)

Smith also discussed his communications with Pertner. Smith stated that Pertner told him "I think at least two or three ramps are missing." (*Id.* at 28:12-13 (*id.* at 7).) Smith noted that "months later" Pertner told him that "I think I was wrong when I told you that. It appears to be [CISD] ramps . . . because . . . Roswell got all the ramps." (*Id.* at 28:15-18 (*id.*).) Smith later noted that Pertner "didn't specify" whether his price estimate for the ramps was based on the purchase price of brand new ramps or the fair market value of the ramps sitting in Rodriguez's yard. (*Id.* at 77:19 (*id.* at 20).) In response to a question from a juror, Smith stated that he "couldn't get a conclusion" whether the PSFA or CISD owned the ramps. (*Id.* 99:3-8 (*id.* at 25).)

Later that day, the Grand Jury refused to issue an indictment and no true bill was returned. (Smith Aff. at 7 (Doc. 29 at 7).)

Rodriguez later retained William Johnson, a private investigator and friend, to gather information about her arrest. (*See* Johnson Aff. (Doc. 55-6 at 1-7).) Johnson obtained "copies of school board records which confirmed that an auction had occurred at [CISD] in late 2006," as well as documentation that "the Plaintiff had purchased items at the auction"—though Johnson does not explain what the documentation was specifically. (*Id.* at 3 (*id.* at 3).) Johnson also obtained an affidavit from Pertner, in which Pertner stated that he had both telephonic and email communications with Smith and quoted a price for a brand new set of ramps, not the particular ramps in Rodriguez's yard. (*Id.* at 5-6 (*id.* at 5-6); Doc. 28-8.)

**DISCUSSION**

**I.      Qualified Immunity**

Summary judgment motions raising the defense of qualified immunity differ from traditional summary judgment motions because "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The second element examines whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1308 (10th Cir. 2015) (quotation omitted). Generally, this requires a decision from the Supreme Court, Tenth Circuit, or the "established weight of authority from other courts." *Id.* (quotation omitted). The Supreme Court has "repeatedly told courts" that clearly established law is not to be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The Tenth Circuit has clarified, however, that "the qualified immunity analysis involves more than 'a scavenger hunt for prior cases with precisely the same facts'" because a general constitutional rule can apply to a novel factual situation. *See Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)). Accordingly, the Tenth Circuit has "adopted a sliding scale to determine when law is clearly established. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Davis v. Clifford*, 825 F.3d 1131, 1136 (10th Cir. 2016) (quoting *Casey*, 509 F.3d at 1284).

The factual analysis in qualified immunity cases also differs. Rather than focus on "material issues that warrant resolution by a jury," the purpose of a qualified immunity analysis is to "determine whether plaintiff's factual allegations are sufficiently grounded in the record

12

such that they may permissibly comprise the universe of facts" that the court will use to analyze the legal question before it. *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring). Said another way, the court will "resolve all issues of material fact in favor of the plaintiff, and then, under that version of the facts, determine the legal question of whether the defendant is entitled to qualified immunity." *Whittier v. Kobayashi*, 581 F.3d 1304, 1307 (11th Cir. 2009). "*Only after* plaintiff has met this initial burden does the burden shift to defendants to prove that no genuine issue of material fact exists." *Gallegos v. City & Cty. of Denver*, 984 F.2d 358, 361 (10th Cir. 1993) (emphasis in original); *see also Stewart v. Donges*, 915 F.2d 572, 580 (10th Cir. 1990) ("The district court in this case denied defendant's motion for summary judgment solely based on the existence of material factual disputes. Thus, implicitly the district court must have concluded that plaintiff had carried his initial burden of alleging conduct in violation of clearly established law.") If the plaintiff fails to satisfy her "heavy two-part burden" and overcome the "rebuttable presumption" of qualified immunity, the defendant is entitled to summary judgment. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The court has discretion to decide which part of plaintiff's two-part burden to analyze first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## II.   Modified Analysis when the Plaintiff's Claims Involve a Subjective Element

"[W]hen the plaintiff's claim contains a subjective element, such as the defendant's purpose, motive, or intent," the normal two-part qualified immunity burden shift "must be modified slightly." *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991). Rather than "merely raise the immunity defense[, the defendant] must make a prima facie showing of the objective reasonableness of the challenged conduct." *Id.* at 356-57 (citations and internal quotations omitted). The defendant likely fails to carry this burden if he merely denies that plaintiff's

allegations establish the culpable mental state. *See id.* at 357 (holding that defendant officers failed to make the prima facie showing of objective reasonableness because they "did not submit any materials in support of their Motion for Summary Judgment" like "affidavits attesting to their good faith or establishing the objective reasonableness of their conduct" but instead merely refuted plaintiff's allegations) (internal citations omitted). "If the defendant makes this prima facie showing, the plaintiff must then produce specific evidence of the defendant's culpable state of mind to survive summary judgment." *Id.*

**ANALYSIS**

Rodriguez's amended response raises three general arguments to defeat qualified immunity: (1) the affidavit for the arrest warrant did not establish probable cause; (2) Smith included false statements in his affidavits; and (3) Smith omitted material facts from his affidavits.

## I.       Probable Cause on the Face of the Arrest Warrant

"Officers must have probable cause to initiate a search, arrest, and prosecution under the Fourth Amendment." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). Said another way, "the affidavit need[] only to establish something 'more than a bare suspicion.'" *Puller v. Baca*, 781 F.3d 1190, 1200 (10th Cir. 2015) (quoting *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011)).

Like an arrest warrant, "[a] search warrant must be supported by probable cause, requiring more than mere suspicion but less evidence than is necessary to convict." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000) (citation and internal quotation omitted). "An

affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *Id.* at 1006.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–923 (1984)). An officer's belief that the warrant contains probable cause is bolstered when a superior and a prosecutor review it before the officer submits it to the magistrate. *Id.* at 1249.

Yet even with judicial approval of his actions, the officer's "shield of immunity" may be lost when he was "plainly incompetent" because "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341, 345 (1986) (quotation and emphasis omitted). Establishing this narrow exception requires the plaintiff to meet a high bar, however, because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause," and "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.

The inquiry in resolving this aspect of Smith's qualified immunity motion, then, "is not whether the magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued. It is instead whether the magistrate so obviously erred that any reasonable officer would have recognized the error." *Messerschmidt*, 132 S. Ct. at 1250.

A.    <u>Was There a Constitutional Violation?</u>

Rodriguez argues that four circumstances establish that "probable cause to arrest Plaintiff was not established by the affidavit for arrest warrant": (1) it "does not establish ownership of the alleged stolen ramps"; (2) it "is based on witness speculation that a crime occurred"; (3) it "contains witness statements that a reasonable officer would have realized were not credible"; and (4) it is "facially invalid because the time period contained in the affidavit for arrest warrant is an arbitrary and manufactured period of time that is not supported by any witness statement, and on its face would fall outside the five (5) year statute of limitations if the alleged theft occurred more than 5 years before August 7, 2012, the date the criminal complaint was filed." (Doc. 55 at 22-25.)

Though no single fact is dispositive and the probable cause analysis is based on the totality of the circumstances as set forth in the affidavit, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003), I discuss each circumstance individually and conclude that Rodriguez has not established a constitutional violation.

i.    <u>Ownership of the Ramps</u>

Rodriguez argues that two things demonstrate that Smith could not establish ownership: (1) "the ramps have no identifying features," and (2) Smith acknowledged that he was uncertain about who owned the ramps in his email to Pertner on August 21, 2012, when he wrote "I need the information I requested to determine the owner of the ramps." (Doc. 55-6 at 34.) Smith responds that Rodriguez "could not prove that she purchased the ramps." (Doc. 60 at 24.)

Though neither party cited a case discussing how New Mexico courts have construed ownership under the larceny statute, *State v. Brown*, 830 P.2d 183, 185 (N.M. Ct. App. 1992), is applicable. It held that "the state need not prove ownership in a particular person; proof that the

property belonged to someone other than the defendant is sufficient." *Id.* (citing *State v. Ford*, 459 P.2d 353, 358 (N.M. Ct. App. 1969) ("Neither an allegation or proof of ownership in a particular person is an essential element of the offense of larceny, it being sufficient that the proof disclosed that property stolen belonged to one other than defendant.")).

Here, the face of the arrest warrant affidavit demonstrates that Smith met the *Brown* standard because he reasonably relied on detailed and consistent witness statements to conclude that a substantial probability existed that Rodriguez possessed ramps that did not belong to her. Specifically, Martin, who drove to Rodriguez's residence with Smith, noted that the ramps in her yard were the same color and material as the ramps at the school and were improperly taken from the school's maintenance yard. (*See* Doc. 28-1 at 4-5.) Valdez stated that the ramps went missing from the storage yard and ended up in Rodriguez's yard shortly after Rodriguez told her that the ramps were not for sale. (*See id.* at 5-6.) Pertner told Smith that some ramps may be unaccounted for. (*See id.* at 6.) And Lovato told Smith that Rodriguez told her and her husband that the ramps were not for sale after her husband asked about them at an auction. (*See id.* at 7). Smith also noted that Rodriguez provided a conflicting explanation in her second interview of how she got the ramps: first, she said she bought the ramp, but later she stated that her father purchased it. (*See id.* at 8.) Finally, Smith noted that Casaus inquired about the ramps, Rodriguez told her that they were not for sale, but then the ramps later ended up in Rodriguez's front yard. (*See id.* at 9.)

This information in the affidavit demonstrates that a number of Rodriguez's co-workers believed Rodriguez took the ramps without permission, and that Rodriguez herself provided an inconsistent story and did not offer proof that she purchased them.

ii.     Witness Speculation

Rodriguez does not further explain this allegation or provide cases in her statements of law that allude to it. Moreover, "[a] police officer can base a probable cause determination upon a witness's statement." *Munday v. Johnson*, 257 F. App'x 126, 131 (10th Cir. 2007) (unpublished).

iii.     Credibility of Witness Statements

Though Rodriguez makes this argument (*see* Doc. 55 at 9-12, 13-16, 31-32), it is better addressed below in the section addressing false statements and material omissions. Rodriguez is asking me consider facts that Smith should have included in the affidavit, rather than whether a reasonable officer would recognize that the face of the affidavit lacked probable cause, which is the standard of review for this analysis. *See Messerschmidt*, 132 S. Ct. at 1250.

iv.     Time Period of the Crime and Statute of Limitations

Rodriguez argues that the affidavit's "absence of a definitive time frame negates probable cause" because "no witness provided a date certain for the alleged theft, and in fact, could only provide a span of years for when they saw the ramps in Plaintiff's yard." (Doc. 55 at 26.) Smith responds that the time periods furnished by the witnesses and listed in the affidavit establish the timeframe. (*See* Doc. 60 at 25-26.)

Rodriguez, however, cites no case to demonstrate that the dates for a crime in an affidavit cannot span a six month time period. And a review of the affidavit demonstrates that Smith included facts for the magistrate's review that the witnesses were not entirely certain of the timeframe. (*See, e.g.*, Doc. 28-1 at 7 ("When asked when [Lovato] first noticed the ramps on Mrs. Rodriguez's property, she stated approximately two (2) years ago but she was not sure. When asked did she first notice these ramps on Mr. [sic] Rodriguez's property during the last

five (5) years, she stated yes.") Moreover, the standard of review weighs in Smith's favor because he received approval from a prosecutor and relied on the magistrate's probable cause determination. *See Messerschmidt*, 132 S. Ct. at 1249.

As for Rodriguez's second argument about the statute of limitations, the following dates and legal standards are pertinent. Both the arrest affidavit and criminal complaint were signed on August 7, 2012. (Doc. 28-1 at 9; Doc. 28-6 at 1.) The arrest affidavit gives a six-month time frame for the crime—"between approximately July of 2007 and December of 2007" (Doc. 28-1 at 1)—and puts the value of the stolen items at between $9,000 to $10,000 dollars—"$4,500.00 to $5,000 per ramp." (Doc. 28-1 at 6). Under the larceny statute, "[w]hoever commits larceny when the value of the property stolen is over two thousand five hundred dollars ($2,500) but not more than twenty thousand dollars ($20,000) is guilty of a third degree felony." NMSA § 30-16-1E. The value of an item is determined by its market value when stolen. *See State v. Gallegos*, 312 P.2d 1067, 1068 (N.M. 1957). The applicable statute of limitations dictates that "[a] person shall not be prosecuted, tried or punished in any court of this state unless the indictment is found or information or complaint is filed . . .  for a third or fourth degree felony, within five years from the time the crime was committed." NMSA § 30-1-8. And "[a] criminal prosecution is commenced when a criminal complaint is filed with a magistrate and a warrant issued thereon." *Mascarenas v. State*, 458 P.2d 789, 792 (N.M. 1969) (overruled on other grounds by *State v. Lopez*, 314 P.3d 236 (N.M. 2013)).

The timing here raises a question: if the statute of limitations falls inside a range of dates for a crime in an arrest warrant affidavit, is the warrant invalid on its face? Rodriguez points to no case indicating invalidity (*see* Doc. 55 at 25-26), and a decision from the New Mexico Supreme Court suggests otherwise. *See State v. Cawley*, 799 P.2d 574, 578 (N.M. 1990) ("[T]he

criminal information in this case, filed September 14, 1988, charged dates that were partially within the limitations period—September 14 through 30, 1983. Although an element unnecessary to provide notice of the crime charged, the time of commission of the offenses contained in the information clearly established that the applicable statute of limitations was satisfied.").

Considered individually and together, I find that Rodriguez's four identified shortcomings with the arrest affidavit fail to demonstrate that a reasonable officer would have read the affidavit and concluded that it lacked probable cause. Other applicable legal standards also favor Smith. Specifically, the facts set forth in the affidavit fall between mere suspicion and proof beyond a reasonable doubt, *see Danhauer*, 229 F.3d at 1005, Smith obtained an arrest warrant rather than make a warrantless arrest, which was the best way for him to demonstrate his good faith belief that he had probable cause, *see Messerschmidt*, 132 S. Ct. at 1245, and a prosecutor approved the affidavit before he submitted it, which further bolsters the conclusion that he sought it in good faith, *see id.* Rodriguez failed to establish a constitutional violation for lack of probable cause on the face of the arrest warrant affidavit.

B.    Was the Law Clearly Established?

Rodriguez's brief does not identify a case that would put Smith on notice that it would have been clear to a reasonable officer that the four identified deficiencies negate probable cause. Her lack of case support is not necessarily fatal to her claim because the sliding scale of egregiousness test discussed in *Davis* could potentially apply. Yet none of the four deficiencies seem sufficiently egregious that the law should be interpreted at an exceedingly high level of generality.

II.     **False Statements and Material Omissions**

"Arrest warrant affiants violate the Fourth Amendment when they 'knowingly . . . or with reckless disregard for the truth,' include false statements in the affidavit." *Bruner v. Baker*, 506 F.3d 1021, 1026 (10th Cir. 2007) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)); *see also Bruning*, 949 F.2d at 357 (citing *Franks* for the proposition that the law regarding false statements was "clearly established" in 1986, the year the defendant officers submitted their affidavits). "A reckless disregard for the truth exists when the affiant in fact entertained serious doubts as to the truth of his allegations, . . . [and] a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) (quotations and citations omitted) (alteration in original).

Likewise, in the Tenth Circuit, it is "a clearly established violation of plaintiff's Fourth and Fourteenth amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause." *Stewart*, 915 F.2d at 582-83. "Recklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause." *DeLoach*, 922 F.2d at 622 (quotation omitted). "However, '[a]llegations of negligence or innocent mistake are insufficient.'" *Bruner*, 506 F.3d at 1027 (quoting *Franks*, 438 U.S. at 171) (alteration in original).

The holding in *Stewart*—which, if read closely, applies only to omissions in an arrest warrant affidavit—applies equally to omissions from search warrant affidavits, though I am unaware of a Tenth Circuit case that states this explicitly. *See Hernandez v. Conde*, 272 F. App'x 663, 670 (10th Cir. 2008) (unpublished) (citing *Stewart* for the legal standard in a case addressing omissions from a search warrant affidavit).

In these circumstances, a court "measure[s] probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant." *Puller*, 781 F.3d 1197.

When deciding whether the modified affidavit establishes probable cause, "where there is a question of fact or 'room for a difference of opinion' about the existence of probable cause, it is a proper question for a jury, even though it is normally determined by a court during the warrant application process." *Bruner*, 506 F.3d at 1028 (quoting *DeLoach*, 922 F.2d at 623).

A.     Relevant Difference Between the Search Warrant and Arrest Warrant Affidavits

As a threshold matter, I agree with Rodriguez that there is one main difference between the arrest and search warrant affidavits, other than a description of the property to be seized and area to be searched set forth in the search warrant affidavit: Smith made a handwritten change to the search warrant affidavit concerning the dates that school employees said an auction did not occur. (*See* Doc. 55 at 26). Specifically, the arrest warrant affidavit notes that school employees stated that they had no records of an auction occurring in 2007, while the search warrant affidavit adds the words "and 2006" to this timeframe, meaning that the employees had no record of an auction in either 2006 or 2007. (*Compare* Doc. 28-1 at 6 *with* Doc. 28-2 at 6.) Smith explained the handwritten change this way in his deposition: "I didn't just add [the words "and 2006" to the search warrant affidavit] on my own. Either the judge or DA had me add it." (Smith Dep. 125:18-19 (Doc. 55-4 at 11).)

Rodriguez attempts to use this difference to demonstrate Smith's culpable mental state. She argues that "had [Smith] included 'late 2006' [sic] in the affidavit for arrest warrant,

Defendant testified that he could not have arrested her. (*Id.* at 135:5-21)." (Doc. 55 at 27 (emphasis omitted).)

I do not agree, however, that the section of Smith's deposition that Rodriguez cited—135:5-21 (Doc. 55-4 at 13)—contains this concession. Smith's deposition testimony addressed whether Rodriguez could be prosecuted if the theft occurred in 2006, not if the auction occurred in 2006, which was the purpose of the handwritten change in the search warrant affidavit. (*Compare* Smith Dep. 135:18-21 (Doc. 55-4 at 13) ("Q: So if the alleged theft took place in 2006, you were out of luck with respect to prosecuting Beverly Rodriguez? A: Correct") *with* Doc. 28-2 at 6 ("It should be noted that investigator McClure asked the employees at the Cuba Independent Schools' business office via an email if there were any records of an auction in 2007 and 2006 and they stated there were no records").) In short, the deposition testimony addressed the statute of limitations for a prosecution while the sentence in the warrant with the handwritten change addressed whether an auction occurred.

B.    Was There a Constitutional Violation?

*Franks*, *Stewart*, and *Bruning* establish that the law regarding false statements and material omissions was clearly established in 2012, the year Smith submitted his affidavits. I therefore consider whether Smith violated Rodriguez's clearly established constitutional rights by making false statements or omitting material facts in the warrant affidavits.

i.    False Statements

Rodriguez argues that Smith included false statements in his affidavits concerning the value of the ramps (*see* Doc. 55 at 8, 30), the time period of the crime (*see id.* at 23), and information conveyed to McClure from school officials concerning when an auction may or may

not have occurred (*see id.* at 27-28). I discuss each individually and find that none constitute a false statement.

a.   Value of the Ramps

Rodriguez argues that Smith "misrepresented the value of the ramps in his affidavits" by overstating the price, which allowed him to bump up the charge from a misdemeanor—with a two year statute of limitations—to a felony—with a five year statute of limitations. (*Id.* at 8, 30.) As evidence, Rodriguez cites the following: (1) Smith acknowledged during his deposition that the ramps in Rodriguez's yard were older and more weathered than those in use at CISD (*see* Smith Dep. 131 9-14 (Doc. 55-4 at 12)); (2) the photographs Smith took on the day of the arrest show that the ramps in Rodriguez's yard were pieces of ramps rather than complete assemblies (*see* Doc. 55-14); (3) Smith stated during his deposition that the Pertner affidavit accurately reflected their conversations, and the Pertner affidavit provided an estimate for a brand new ramp, not the ramps in Rodriguez's yard (*see* Smith Dep. 136:15-22 (Doc. 55-4 at 13)); and (4) Valdez confirmed that Rodriguez possessed only pieces of ramps (Smith-Valdez Interview Tr. 5:4-6 (Doc. 55-2 at 2)). (Doc. 55 at 8, 30.)

Smith responds that he "contacted Mr. Pertner, provided Mr. Pertner with pictures and Mr. Pertner gave him an estimate of the value of the ramps, which Sgt. Smith used and relied upon. The fact that Mr. Pertner changed his assessment under questioning by Plaintiff's investigator does not change what he initially told Sgt. Smith." (Doc. 60 at 11.)

A review of the warrant affidavits (Doc. 28-1 at 6; Doc. 28-2 at 6), Smith's affidavit (Doc. 29), Pertner's affidavit (Doc. 28-8), and the email exchange between Smith and Pertner (Doc. 28-7) reveals that Smith accurately represented his conversation with Pertner in the warrant affidavits. The warrant affidavits note that Smith sent the email to Pertner, "attached

24

photographs of the same ramps which are currently located on Cuba Independent Schools' property and on Beverly Rodriguez's property," "asked Mr. Pertner for an approximate value of these ramps," and got a response of "$4,500.00 to $5,000.00 per ramp." (Doc. 28-1 at 6.) Though these conversations might suggest a facial infirmity with the affidavits—perhaps because of an ambiguity about whether the valuation applied to the ramps at CISD or the ramps in Rodriguez's yard—I fail to see a mischaracterization of the conversations. Additionally, Valdez's statement about incomplete ramps is not important because Smith drove to Rodriguez's property, personally observed the ramps, and then included his personal observations in the warrant affidavits. (*See* Doc. 28-1 at 4; Doc. 28-2 at 4.) Lastly, Rodriguez did not state that the ramps were in pieces in her interviews with Smith; she referred to them as ramps. (*See, e.g.*, Second Smith-Rodriguez Interview Tr. 38:22-23 (Doc. 55-13 at 3).)

b.    Time Period

Rodriguez argues that Smith "falsified the time period in which the crime allegedly occurred" to bring the charges within the statute of limitations, and that Smith's "statement that the alleged crime occurred between July and December 2007 is not established by any witness statement included in the affidavit." (Doc. 55 at 23.) Smith responds that he permissibly asked witnesses whether the crime occurred within the past five years and used their statements to guide his six-month estimate of when the crime occurred. (*See* Doc. 60 at 26-27.)

I find that Smith estimated, rather than falsified, the time period of the crime using the range of dates provided by the witnesses. The affidavits note that Martin stated the theft occurred "in 2007 or 2008"; Valdez stated that "she observed the ramps in Mrs. Rodriguez's yard less than a month after they were missing from the warehouse area," and that the ramps went missing "sometime after" the auction "in 2006 or 2007"; Lovato stated that she first saw the ramps on

25

Rodriguez's property "approximately two (2) years ago but she was not sure[,]" and that the auction when Rodriguez told Lovato's husband the ramps were not for sale "was definetly [sic] during the last five (5) years"; and Casaus stated that she observed the ramps on Rodriguez's property "two (2) weeks after the auction" where "Rodriguez told her the ramps were not for sale." (Doc. 28-1 at 5-7, 9; Doc. 28-2 at 4-5, 7-9.) Had Smith picked an exact date for the crime, Rodriguez's argument would be much stronger, but the six-month time frame demonstrates that Smith was estimating the dates of the crime.

c.    Information Conveyed to McClure from the School

Rodriguez argues that Smith's affidavits contain a misrepresentation about a conversation between McClure and a school official about when an auction may have occurred. (*See* Doc. 55 at 27-28.) Smith does not address this argument in his reply.

Below for comparison are the relevant excerpts from the arrest warrant affidavit, search warrant affidavit, and email from the CISD business office.

The relevant section from the arrest warrant affidavit reads: "It should be noted that Investigator McClure asked the employees at the Cuba Independent Schools' business office via an email if there were any records of an auction in 2007 and they stated there were no records." (Doc. 28-1 at 6)

The relevant section from the search warrant affidavit reads: "It should be noted that Investigator McClure asked the employees at the Cuba Independent Schools' business office via an email if there were any records of an auction in 2007 and 2006 and they stated there were no records." (Doc. 28-2 at 6 (the words "and 2006" are Smith's handwritten change).)

And the relevant email from the school official to McClure reads: "Since 2001, I only know of one auction that has taken place at the district . . . I am unable to locate any paperwork regarding that auction and I do not know what year the auction took place." (Doc. 55-5 at 3.)

I find that Smith's statements in his affidavits are not misleading. Smith was correct that the school had no records of an auction in either 2006 or 2007.

Even if I were to conclude that any or all of these three statements in the warrant affidavits were inaccurate, Rodriguez has failed to demonstrate that a jury could infer that Smith made the statements either knowingly or with reckless disregard for the truth. At best, these three circumstances could demonstrate that Smith had a reckless disregard for the truth. Yet Rodriguez has not shown that Smith "in fact entertained serious doubts as to the truth of his allegations," *Bruning*, 949 F.2d at 357 (quotation omitted), or demonstrated "circumstances evincing obvious reasons to doubt the veracity of the allegations," *DeLoach*, 922 F.2d at 622 (quotation omitted). Rodriguez does not frame her arguments in terms of these standards of review, and I fail to see how she meets them.

ii.     Material Omissions

As for material omissions, Rodriguez argues that Smith omitted facts from his affidavits concerning Casaus's credibility (*see* Doc. 55 at 10, 11), Martin's credibility (*see  id.* at 5-6, 9, 11, 31-32), the weight of the ramps (*see id.* at 9-10, 12, 30-31), the names of people that Rodriguez stated could corroborate her version of the events (*see id.* at 12, 16), the actual date the ramps were allegedly stolen (*see id.* at 12), the lack of a report that the ramps were stolen (*see id.* at 28), ambiguity regarding ownership of the ramps (*see id.* at 12, 28), the lack of unique identifying features on the ramps (*see id.* at 12, 29), and that Pertner's estimate of the value of the ramps was for a complete new ramp rather than used pieces of ramps (*see id.* at 30).

I apply the following two-part analysis when considering the alleged omissions: first, I ask whether the omitted information was material, such that its inclusion would have vitiated probable cause; and second, if the omissions are material, I ask whether Rodriguez has met the subjective element to demonstrate that Smith had a knowing or reckless disregard for the truth. *See Robitaille v. Spitzer*, --- F.Supp.3d ---, ---, 2016 WL 1258602, *3 (D. Colo. Mar. 30, 2016) (interpreting *Bruning* and *Stewart* to create this two-part analysis).

I note that neither party discussed how the Tenth Circuit has applied the materiality standard from *Stewart*—i.e., when the inclusion of omitted information was material because it would have "vitiated probable cause." 915 F.2d at 582-83. My review of the cases where the Tenth Circuit denied qualified immunity based on material omissions in an affidavit suggests that an omission typically vitiates probable cause when it undermines the primary or sole basis for probable cause in a warrant affidavit. *See Stewart*, 915 F.2d at 583 ("[W]e can conceive of few omissions which would be more material than the failure to disclose that the main complainant had recanted his testimony and confessed it was a fabrication"); *Bruning*, 949 F.2d at 359 ("[T]he omissions here directly undermine Victim #1's alleged identification of Plaintiff as her assailant. That identification was virtually the only evidence linking Plaintiff to either of the assaults, and without it, there would be no probable cause to believe Plaintiff was the assailant"). *Robitaille*, a very recent case from the District of Colorado, involved a similar circumstance. 2016 WL 1258602, *4 ("Because the inclusion of such information would invalidate the *only* assertion to support probable cause included in the affidavit—the implication that Dale Sisneros had identified Penny and Duane as the suspects—the omissions are material") (emphasis retained).

The only case I found where the Tenth Circuit or a district court in the Tenth Circuit denied qualified immunity and the omission did not relate to the officer's primary or sole basis for probable cause was *DeLoach*, but the omitted facts there were egregious. 922 F.2d at 620-624 (noting in criminal prosecution following the death of an infant that the officer stated "[p]ayback is hell, that's what [the arrestee] got for hiring a smart-ass lawyer," the officer "conceal[ed] the exculpatory opinion of a key medical expert" to avoid *Brady* disclosures, and "the district attorney dropped the charges upon learning of [the key medical expert's] views" and testified that "if [the key medical expert's] opinion had been known before DeLoach's arrest, she would not have been arrested").

Here, the alleged omissions, considered individually and together, are not material because they do not rise to this standard. I discuss each alleged omission individually, in the order that corresponds to the opening paragraph of this section.

a.   Casaus's Credibility

Though Smith investigated Casaus for fraud, the record does not indicate that Casaus was charged with a crime, and Rodriguez points to no case to establish that credibility must be included in an affidavit or that the suspect of an investigation cannot be used to establish probable cause in an affidavit for an unrelated case.

b.   Martin's Credibility

Though Martin did not get along with Rodriguez, he never recanted his allegations about her criminal activity—even after Smith interviewed Martin for a second time in preparation for the grand jury (*see* Doc. 55-12)—and Smith included in the affidavits that Martin changed his recollection of the amount of stolen ramps from "three or four" to "two," which was a

transparent way to alert the reviewing assistant district attorney and magistrate that Martin modified his initial statement, (*compare* Doc. 28-1 at 3 *with id.* at 5).

c.    <u>Weight of the Ramps</u>

Pertner's email discussing the weight of the ramps, where he stated "I would think these two ramps would be too heavy for men to carry" (Doc. 55-6 at 34), would not vitiate probable cause because the affidavit cites four witness—Martin, Valdez, Lovato, and Casaus—that provide information indicating that Rodriguez stole the ramps (*see* Doc. 28-2 at 3-5, 7-9). Moreover, the search warrant affidavit notes that Rodriguez "was never able to produce a receipt." (*Id.* at 8.) Though the means of transportation for Rodriguez to complete the alleged theft may have been in dispute, the fact that Rodriguez appeared to possess property that did not belong to her was not.

d.    <u>Names of Alibi Witnesses</u>

Though Smith could have interviewed or included the names of people that may have been able to corroborate Rodriguez's version of the events, Rodriguez cites no case that suggests an officer must interview supposed alibi witnesses, and the Tenth Circuit has held that an officer is not required to do so. *See Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) ("Plaintiff contends that . . . under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree."); *see also Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1257 n.8 (10th Cir. 1998) (noting that "an officer may not ignore a videotape which records the alleged criminal acts" but in general "officers are not required to conduct full investigations before making an arrest").

30

e.      Six-Month Crime Timeframe

As for the six-month timeframe for the crime in the affidavits, Smith was transparent. He included the range of dates provided by the witnesses, and the magistrate could clearly conclude that the six-month timeframe was an estimate derived from the witness statements.

f.      No Report that the Ramps Were Stolen

As for the lack of a report by either CISD or PSFA that the ramps were stolen, I disagree with Rodriguez's assumption that a police report is required to establish theft. I also disagree that *State v. McKenzie*, 144 P.2d 161, 164 (N.M. 1943), demonstrates that the omission is material. In *McKenzie*, the Court held that "[t]he unexplained possession by one of goods belonging to another does not raise the presumption that a larceny has been committed, and that the possessor is a thief; additional evidence is necessary to establish the corpus delicti." *Id.* (quotation and citation omitted). Here, Smith cited "additional evidence"—namely, the numerous witnesses that stated Rodriguez took the ramps without permission—so *McKenzie* is distinguishable.

g.      Ambiguity About Who Owned the Ramps

Rodriguez's argument that Smith omitted that he was uncertain about who owned the ramps is not material because, under *Brown*, 830 P.2d at 185, Smith did not need to identify the owner.

h.      The Ramps Had No Identifying Features

Like the six-month time frame for the crime, Smith included information to demonstrate that the ramps lacked unique identifying features, so it was clear to the magistrate that the ramps were not unique items. (*See* Doc. 28-1 at 3 ("[Martin] described these ramps as metal, tan or beige in color and they have ½ inch metal tubing on the rails"); *see also* Doc. 28-2 at 1

(description of items to be seized in the search warrant: "[t]wo (2) tan in color metal ramps which are the type that are assigned to portable buildings").)

i.    <u>Pertner's Valuation of the Ramps</u>

Rodriguez's last alleged omission deals with Pertner's price valuation of the ramps. There is a tension between the Pertner affidavit and Smith's warrant affidavits. The Pertner affidavit states that Pertner had "contact with Agent Smith . . . telephonically and through e-mails," expressed his opinion that "a new complete ramp system could cost as much as five-thousand-dollars ($5,000.00)," and that they failed to discuss the actual ramps in Rodriguez's yard, because "Agent Smith did not ask [Pertner's] opinion regarding the current value of the sections of metal ramps displayed in the photographs [Smith] provided and [Perter] did not volunteer an opinion as to their value." (Doc. 28-8 at 3.) Smith, on the other hand, noted in his deposition that the ramps in Rodriguez's yard were "older, or more weathered," (Smith Dep. 131:13 (Doc. 55-4 at 12)), and that he reviewed the Pertner affidavit, and "it looks consistent with what he told me," (*id.* at 136:22 (*id.* at 13)).

Yet including a more robust discussion of Pertner's price estimate would not vitiate probable because the probable cause analysis and statute of limitations analysis are analytically distinct and occur at different stages of a criminal prosecution. There appears to be no case in the Tenth Circuit that would have put Smith on notice that he must consider the statute of limitations when submitting a warrant affidavit, and other circuits have expressly rejected the argument that an officer can be held liable for arresting someone after the statute of limitations has expired. *See Sands v. McCormick*, 502 F.3d 263, 267, 269 (3d Cir. 2007) ("Sands' argument [that the officer 'did not have probable cause to arrest Sands because he was aware that the statute of limitations had expired'] is based on the faulty premise that the statute of limitations is a relevant

32

consideration at the time a police officer files charges"); *Pickens v. Hollowell*, 59 F.3d 1203, 1207 (11th Cir. 1995) ("[P]olice officers have no responsibility to determine the viability of a statute of limitations defense when executing a valid arrest warrant."). Though Smith may have omitted information, there is no requirement that he include information about—or even think about—the statute of limitations when submitting a warrant affidavit because the existence of probable cause is unaffected by the statute of limitations. The alleged material omissions do not meet the materiality test because they would not vitiate probable cause if included in the affidavits.

### CONCLUSION

Rodriguez has not demonstrated that Smith violated a clearly established constitutional right. She has not demonstrated that it would be obvious to a reasonably competent officer that the affidavits lacked probable cause. Nor has she demonstrated that Smith knowingly or with reckless disregard for the truth included false statements or made material omissions in the warrant affidavits. Smith's motion for summary judgment (Doc. 28) is granted.

This Order does not close the case, however, because Rodriguez's Amended Complaint added a new claim for malicious prosecution (*compare* Doc. 1 *with* Doc. 69), and Smith's motion for summary judgment, which he filed before Rodriguez filed her Amended Complaint, did not address this new claim.

William P. Lynch
United States Magistrate Judge