IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BEVERLY RODRIGUEZ,

    Plaintiff,

v.                                                                                    15cv681 WPL/LF

JEFFREY SMITH,

    Defendant.

**ORDER GRANTING SMITH'S SECOND MOTION FOR SUMMARY JUDGMENT**

Defendant Jeffrey Smith filed a Motion for Summary Judgment on the Basis of Qualified Immunity on Plaintiff's Malicious Prosecution Claim ("Second MSJ"). (Doc. 77.) Plaintiff Beverly Rodriguez filed a response (Doc. 82), and Smith filed a reply (Doc. 85). Having read and considered the briefing, case record, and relevant law, I grant Smith's motion.

**BACKGROUND**

Smith's Second MSJ addresses the new and sole remaining claim in Rodriguez's First Amended Complaint—that Smith's actions in investigating and seeking to prosecute her for allegedly stealing metal handicap access ramps from the Cuba Independent School District ("CISD") constituted malicious prosecution under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983. (*See* Doc. 69 at 12-20.)

I dismissed all the claims in Rodriguez's original complaint when I entered my order granting Smith's motion for summary judgment on the basis of qualified immunity ("First Order" granting "First MSJ"). (Docs. 70 and 28, respectively.) Before my ruling, however, Rodriguez filed her First Amended Complaint (Doc. 69), and Smith did not withdraw and revise

his already fully briefed First MSJ (Doc. 64). This meant my First Order could not address Rodriguez's new malicious prosecution claim. (*See* Doc. 70 at 33.)

My First Order contains a ten page fact section (*see* Doc. 70 at 2-11), but neither party believes it is importable to this Order. Smith would like me to adopt the facts set forth in his First MSJ (*see* Doc. 77 at 2), while Rodriguez "intends to appeal . . . and therefore disputes the facts" in my First Order and devotes nearly half of her response to correcting "errors and omissions" and offering clarifications (Doc. 82 at 1).

Given that I considered the facts from Smith's First MSJ when I determined the facts for my First Order, there is no need to address them again here. As for Rodriguez, her response begins with seven proposed factual corrections. (Doc. 82 at 2-6.) I address the additional facts individually and construe each in the light most favorable to Rodriguez, as the non-movant, but will not adopt a disputed fact if it is so contradicted by the record that "no reasonable jury could believe it." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

First, Rodriguez cites a part of Smith's deposition that "[n]either party provided . . . in briefing associated with the first MSJ" to show that Smith submitted his investigative report to the district attorney for the prosecution of the bus contractors, including Rodriguez's uncle, in late spring 2012, which was "a number of months after his two interviews with Ms. Rodriguez and the other witnesses he relied on in drafting the warrants and criminal complaint." (Doc. 82 at 2.) Rodriguez argues that this timeline demonstrates "Smith's intent in initiating the criminal proceeding" and shows that he was angry the district attorney did not pursue charges. (*Id.*)

I adopt Rodriguez's fact about when Smith submitted his investigative report, but not the accompanying inference about his intent. The new fact should be added to my discussion of Smith's investigative report on the top of page three of my First Order as follows:

>Smith was not certain when he submitted his investigative report to the district attorney but estimated it was "late spring, maybe," which Rodriguez's counsel confirmed was "late spring of 2012." (Smith Dep. 53:12-21 (Doc. 82-1 at 1).)

Second, Rodriguez argues that Smith gave two conflicting accounts of his interview with Carmen Gallegos—one in his warrant affidavits and the other in his affidavit attached to his First MSJ—and I relied on the latter, inaccurate account in my First Order. (*See* Doc. 82 at 2-3.) I wrote: "Gallegos stated that two metal ramps that were used during the high school construction project were in Rodriguez's front yard. [Smith Aff. at 2 (Doc. 29 at 2).)]." (Doc. 70 at 4.) The warrant affidavits note that Investigator McClure stated that Rodriguez had ramps in her front yard and then asked Gallegos where Rodriguez obtained them, while Smith's affidavit attached to his First MSJ suggests that Gallegos unilaterally identified the ramps. (*Compare* Doc. 28-1 at 3 *and* Doc. 28-2 at 3 *with* Doc. 29 at 2.) I agree that the two statements conflict.

I therefore revise the fact in the second paragraph on page four of my First Order as follows:

>Investigator McClure told Gallegos that he observed two metal ramps that were used during the school construction project to access the portable buildings in Rodriguez's front yard. (*See* Docs. 28-1 at 3, 28-2 at 3.) When asked where the ramps in Rodriguez's yard came from, Gallegos replied that they came from portable buildings at CISD. (*Id.*)

Third, Rodriguez argues that Smith's warrant affidavits and my First Order omitted material facts about witness Garrison Martin's relationship with Rodriguez that go "to the probable cause analysis and Smith's intent." (Doc. 82 at 3.) The statements come from Smith's first interview with Martin. (*See* First Smith-Martin Interview Tr. (Doc. 55-7).) First, she points to Martin's statements about his working relationship with her and the team she managed, including that Martin thought she was prejudiced against him because he was Indian, and that his four coworkers did not support him because they were Hispanic. (*See* Doc. 82 at 3.) Second,

3

Rodriguez points to an exchange between Smith and Martin, where Smith confirmed that Martin was the only Indian working for Rodriguez, and commented that it "could be a clue" to explain why Martin and Rodriguez did not get along. (*See id.*)

Though I do not find these additional facts particularly relevant, I add them to my discussion of Smith's first interview with Martin on the bottom of page three of my First Order as follows:

> Martin stated that he and Rodriguez "butted heads" and "didn't like each other" because Martin is "an Indian" "[a]nd . . . very efficient" in his work. (First Smith-Martin Interview Tr. 25:14, 18-23 (Doc. 55-7 at 1).) Smith asked Martin if he was the "the only Navajo or Dine" that Rodriguez supervised. (*Id.* at 27:3-4 (*id.*).) Martin answered "[y]eah," to which Smith responded: "Oh. Okay. That could a clue. Yeah." (*Id.* at 27:5-7 (*id.*).) Martin went on to state that his four co-workers "never backed [him] up" during his conflicts with Rodriguez "because they were all Hispanic." (*Id.* at 27:22-23 (*id.*).)

Fourth, Rodriguez argues that my First Order "[o]mitted . . . that Mr. Martin initially stated that he allegedly observed Mrs. Rodriguez take 'maybe 3 or 4 ramps', but after viewing the two sections of ramps in Mrs. Rodriguez' yard while with Defendant, Martin stated that she had only taken two (2) ramps." (Doc. 82 at 4.)

Review of my First Order, however, reveals that I discussed Martin's first estimate—that Rodriguez took three or four ramps—three times: twice in the Background section and a third time in a stand-alone paragraph in the Analysis section discussing Martin's credibility. (*See* Doc. 70 at 3, 10, 29-30.) My First Order already notes that Martin changed his estimate, so there is no need to add it here.

Fifth, Rodriguez argues that my First Order omitted two material facts contained in Gerald Pertner's affidavit: (1) that Pertner stated that his ramp price estimate was for a brand new, complete ramp system, not the more weathered pieces of ramps in Rodriguez's yard, and

4

(2) that Pertner stated the photos Smith emailed him depicted pieces of ramps, and that Pertner was not asked to estimate the value of the pieces. (*See* Doc. 82 at 4-5.)

My First Order discussed these facts twice in the Analysis section (*see* Doc. 70 at 24-25, 32-33), but did not include them in the Background section. I therefore add them to my discussion of Smith's interaction with Pertner in the middle of page five of my First Order as follows:

> Rodriguez includes an affidavit from Pertner, wherein Pertner states that he told Smith "a new complete ramp system could cost as much as five-thousand-dollars" but that "Smith did not ask my opinion regarding the current value of the sections of metal ramps displayed in the photographs he provided and I did not volunteer an opinion as to their value." (Pertner Aff. at 2-3 (Doc. 28-8 at 2-3).)

Sixth, Rodriguez argues that two statements from Smith's deposition weaken a fact in my First Order discussing the information the State Auditor gave Smith about whether an auction occurred at CISD. (Doc. 82 at 5.) The fact in my First Order reads as follows: "Smith contacted the New Mexico Office of the State Auditor, who informed him that they had no proof that Rodriguez purchased the ramps in 2006 or 2007. (Smith Dep. 120:12-19 (Doc. 28-3 at 11).)" (Doc. 70 at 7.) The two statements from Smith's deposition that Rodriguez believes weaken this fact are paraphrased as follows: (1) Smith learned through his conversation with the State Auditor's Office that the Office only maintains records of school auctions for five years (*see* Doc. 82 at 5 (citing Smith Dep. 143:21-25, 144:1-11 (Doc. 82-1 at 3))), and (2) Smith also learned that the Office had no knowledge whether a CISD auction occurred in 2006 or 2007 (*see* Doc. 82 at 5 (citing Smith Dep. 145:20-25, 146:1-5 (Doc. 82-1 at 4))).

The first omitted fact is material because it clarifies Smith's statement earlier in his deposition that the State Auditor's Office had no proof of an auction. The second fact, however, is not material because the section of the deposition Rodriguez cites is vague—it only seems to

indicate that Smith included information about his communication with the State Auditor's Office in his 165 page report. (*See* Smith Dep. 145:20-25, 146:1-5 (Doc. 82-1 at 4).) I therefore add the following fact to my discussion of Smith's communication with the State Auditor's Office on the bottom of page seven of my First Order:

> Smith also stated he believed the State Auditor's Office was bound by "the public records rule" and would maintain records of the auction for "five years." (Smith Dep. 144:1-11 (Doc. 82-1 at 3).)

And seventh, Rodriguez argues that Smith omitted two material facts when testifying before the grand jury, and I should have noted the two omissions in my First Order. (*See* Doc. 82 at 5-6.) The first omission was that Smith did not name the entire group that Martin alleged stole the ramps—Rodriguez, her brother, and other contractors—instead testifying that Martin told him he saw Rodriguez and one other person steal the ramps. (*See id.*) The second omission was that Smith testified that no witness changed his or her testimony, even though Martin did not initially name Andrew Miranda as a co-conspirator. (*See id.* at 6.)

It is not necessary to explicitly note these omissions because the Background section in my First Order discusses both of Smith's interviews with Martin—including numerous direct quotations—which provides Rodriguez the necessary factual background to argue that Smith omitted information when testifying before the grand jury. (*See* Doc. 70 at 3, 9.)

I have adopted some of Rodriguez's proposed additional facts. The facts I use to resolve this motion, then, are those from my First Order (Doc. 70 at 2-11), plus the additional facts incorporated or substituted above.

## DISCUSSION

My First Order discussed qualified immunity and the law regarding false statements and material omissions in warrant affidavits. (*See* Doc. 70 at 12-14.) I do not repeat it here. The law

regarding 42 U.S.C. § 1983 malicious prosecution claims, at issue in this motion, has proved harder to distill. *See Cordova v. City of Albuquerque*, 816 F.3d 645, 661-62 (10th Cir. 2016) (Gorsuch, J., concurring) (discussing the question of "malicious prosecution and its place (or not) in the Constitution" and remarking that "any effort to enter the arena and consider the question carefully is likely to leave you looking for the exits"); *see also Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007) ("This case requires us to wade into the murky waters of § 1983–based malicious prosecution claims.").

The Tenth Circuit has "analogized a § 1983 malicious prosecution claim to the common law tort of malicious prosecution in articulating its [five] elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011) (quoting *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007)). "[T]he common law tort—while not entirely imported into § 1983—provides a useful guidepost in making sense of alleged constitutional injuries." *Becker*, 494 F.3d at 913-14. Smith concedes the first two elements (*see* Doc. 77 at 4), but the parties disagree about whether Rodriguez can establish the third and fourth elements—the existence of probable cause and malice. The Tenth Circuit has told courts how to evaluate probable cause in this circumstance, but has not provided similar guidance on malice.

To determine probable cause in a malicious prosecution claim, the court considers "whether the evidence supported a reasonable belief in [the defendant's] guilt" at "the time of prosecution." *McCarty*, 646 F.3d at 1286, 1287. "Probable cause exists if the facts and

circumstances are sufficient to warrant a person of reasonable caution to believe a crime has been committed." *Id.* at 1286 (citation omitted).

As for malice, it is not clear whether the applicable definition comes from the state jurisdiction in which the district court sits or prior Tenth Circuit decisions. A recent unpublished Tenth Circuit decision cited the definition of malice from a Colorado Supreme Court case when deciding a § 1983 malicious prosecution claim against a city in Colorado and one of its officers, but it is not clear if the court applied the definition to resolve the appeal. *See Chavez-Torres v. City of Greeley*, 660 F. App'x 627, 629 (10th Cir. 2016) (unpublished). At least two published Tenth Circuit cases, however, have relied on stipulations or definitions from earlier Tenth Circuit decisions. *See Fletcher v. Burkhalter*, 605 F.3d 1091, 1095 (10th Cir. 2010) (noting that the parties agree that malice "requires intentional or reckless disregard of the truth" and citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1297 (10th Cir. 2004), where the court did not define it); *see also Novitsky*, 491 F.3d at 1258 (holding that malice was not present because the plaintiff did not show a misstatement in a police report was intentional and citing *Taylor v. Meacham*, 82 F.3d 1556, 1563 (10th Cir. 1996), which also did not define malice.) *Chavez-Torres* and *Novitsky*, nevertheless, are consistent on the government actor's required mental state: "malice, in the context of malicious prosecution, requires evidence of intent, not mere negligence." *Chavez-Torres*, 660 F. App'x at 629 (citing *Novitsky*, 491 F.3d at 1258-59 and *Fletcher*, 605 F.3d at 1095).

Though not dispositive on the issue, the parties agree that the applicable definition of malice comes from a New Mexico Supreme Court case, *DeVaney v. Thriftway Marketing Corporation*, 953 P.2d 277, 283 (N.M. 1997), overruled on other grounds by *Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009), which defined malice as "a primary motive by the defendant in

misusing the process to accomplish an illegitimate end." (*See* Doc. 77 at 10, Doc. 82 at 24.) "Malice . . . may be inferred by the jury from the want of probable cause. But the want of probable cause can not be inferred from any degree of even express malice." *DeVaney*, 953 P.2d at 287-88 (quoting *Leyser v. Field*, 23 P. 173, 174 (N.M. 1890)).

Though the source of the malice definition is unclear, the Tenth Circuit is unequivocal about the importance of the underlying claim: "[t]he core inquiry under any § 1983 action . . . is whether the plaintiff has alleged an actionable constitutional violation." *Becker*, 494 F.3d at 914 (citation omitted). The constitutional violations asserted in Rodriguez's First Amended Complaint are raised under the Fourth and Fourteenth Amendments. (*See* Doc. 69 at 19 ("Plaintiff had a Fourth Amendment right to be free from prosecution without probable cause"); ("Plaintiff had a Fourteenth Amendment right to be free from wrongful initiation and promotion of criminal prosecution").)

The Tenth Circuit has recognized both of these claims. *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). Addressing the Fourth Amendment claim, the court has held that "malicious prosecution concerns detention only '[a]fter the institution of legal process.'" *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008) (citing *Mondragon*, 519 F.3d at 1083) (alteration in original). "At common law, the issuance of an arrest warrant represents a classic example of the institution of legal process." *Id.* at 799. A plaintiff "challenging that process by alleging the officers knowingly supplied false information in affidavits for the warrants" implicates "the probable cause determination during the institution of legal process . . . [which] supplies the necessary connection between the malicious prosecution cause of action and [a plaintiff's] Fourth Amendment allegations." *Id.*

As for malicious prosecution under the Fourteenth Amendment, claims can potentially arise under both the substantive and procedural due process guarantees. *See Becker*, 494 F.3d at 918. Substantive due process claims are available in "the narrowest of circumstances" and require behavior from a government actor that shocks the conscience. *See id.* at 922-923. In *Becker*, the Tenth Circuit noted that the "unavoidable construction" of the Supreme Court's plurality opinion in *Albright v. Oliver*, 510 U.S. 266, "is that no § 1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment." 494 F.3d at 918. Yet the court still analyzed such a claim and concluded that it was "not a case that reveals a substantial deprivation sufficient to rise to the level of a substantive due process violation." *Id.* at 922.

Procedural due process claims for malicious prosecution under § 1983, in turn, are not cognizable when "state tort remedies meet the procedural requirements of the Due Process Clause." *Id.* at 921 (citing *Parratt v. Taylor*, 451 U.S. 527, 535-44 (1981)); *see also Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013) ("If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy—such as a state tort claim—will satisfy due process requirements.") (citing *Becker*, 494 F.3d at 921).

The Tenth Circuit does not appear to have issued a panel opinion deciding if New Mexico tort law provides an adequate remedy to § 1983 malicious prosecution claimants. However, in *Cordova*, Judge Gorsuch stated in concurrence that "there's no question in [the] case that state tort law provides adequate remedies to resolve the plaintiff's complaint. Indeed, we know that New Mexico enjoys a rich common law, one that provides a well-defined tort

against the 'malicious abuse of process.'"[1] 816 F.3d at 662. The New Mexico Court of Appeals has reached the same conclusion. *See Benavidez v. Shutiva*, 350 P.3d 1234, 1243 (N.M. Ct. App. 2015) (affirming the trial court's dismissal of the plaintiff's § 1983 malicious prosecution claim because "New Mexico tort law provides a remedy for malicious abuse of process").

## ANALYSIS

### I. Fourth Amendment Claim

At least two seizures under the Fourth Amendment occurred in this case: one when Rodriguez was arrested and transported to the Sandoval County Detention Center[2]; the other when the Department of Transportation, at Smith's request, removed the two ramps from her front yard.

Smith argues that the seizures were based on probable cause, and cites repeatedly to my First Order, which found probable cause. (*See* Doc. 77 at 3-10.) Rodriguez denies that Smith had probable cause and mostly reargues her response to Smith's First MSJ. (*Compare* Doc. 82 at 14-24 *with* Doc. 55 at 22-37.) Notably absent from Rodriguez's response to Smith's Second MSJ, however, is an explanation of how her seven additional facts alter the probable cause analysis in my First Order. Below, I discuss the significance of each additional fact, but note that the probable cause determination is based on the "totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Rodriguez's first additional fact—that Smith sought to prosecute her to obtain information about her uncle's alleged criminal activities and assuage frustration over the district attorney's inaction—does not alter the probable cause analysis because Rodriguez cites no case

---

[1] "Malicious abuse of process" is New Mexico's combined tort of malicious prosecution and abuse of process. *See DeVaney*, 953 P.2d at 279.
[2] Rodriguez's First Amended Complaint does not note how long she was held at the detention center before she was released. (*See* Doc. 69 at 7.)

11

to suggest that either of these motivations, assuming they are true, undermine the existence of a reasonable belief in probable cause to justify a prosecution. Said another way, Rodriguez cites no case to suggest that an officer's subjective motivations undermine the objective evaluation of probable cause under the Fourth Amendment. Her lack of authority is unsurprising. *See, e.g.*, *United States v. Huff*, 782 F.3d 1221, 1226 (10th Cir. 2015) ("For probable cause to exist, an officer need only have the specific factual knowledge that justifies a search or arrest, regardless of the officer's actual motivation.") (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)).

Rodriguez's second additional fact—that Gallegos did not unilaterally identify the ramps in Rodriguez's yard but rather confirmed Investigator McClure's observation—is not material because Gallegos still positively identified the ramps. In addition, Rodriguez's argument is somewhat self-defeating: the depiction of the conversation that she believes is most accurate is from Smith's warrant affidavits, which the state magistrate and state district judge used to evaluate probable cause before issuing the warrants. In other words, the magistrate and district judge relied on an accurate description of the conversation when evaluating probable cause.

Rodriguez's third additional fact—which includes direct quotations from Martin about workplace conflicts with Rodriguez—is not material. Martin did not recant his allegations about Rodriguez during his second interview with Smith, and Rodriguez cites to no case indicating that witness animosity undermines an officer's reasonable belief in probable cause.

I did not adopt Rodriguez's fourth additional fact.

Rodriguez's fifth additional fact—that Pertner stated in his affidavit that his price estimate of $5,000 was for a brand new ramp system, not the more weathered ramps in Rodriguez's front yard—does not undermine Smith's reasonable belief in Rodriguez's guilt

because the sub-section of the larceny statute that Smith charged Rodriguez with violating had a minimum threshold value of stolen goods of $2,500. *See* NMSA § 30-16-1(E); (*see also* Doc. 28-1 at 1 (Affidavit for Arrest Warrant charging Rodriguez with violating "30-16-1 (E) NMSA 1978").) The question then is whether it was unreasonable for Smith to believe that Rodriguez illegally possessed ramps—or ramp parts—worth at least $2,500. It was not unreasonable: if two new ramp systems cost $10,000—at $5,000 per ramp—then believing that two older partial ramp systems could be valued at $2,500—at $1,250 per ramp—is a reasonable estimate that accounts for depreciation.

Rodriguez's sixth additional fact—that the State Auditor's Office told Smith that it maintains records for five years and therefore had no way of determining whether an auction occurred—is of minor relevance. Smith's deposition reveals that he mentioned his conversation with the Auditor's Office to explain why he executed the arrest warrant—not as indicia of probable cause. (*See* Smith Dep. 120:12-19 (Doc. 28-3 at 11)) ("Three days before the arrest, I contacted the state auditor's office . . . So what am I thinking . . . the state auditor is going to have proof that she bought those ramps . . . I'm going to quash the warrant . . . Nope, they have no proof, either. So that's why the arrest occurred three days later.").) The newly adopted fact does little to suggest that Smith lacked a reasonable belief in Rodriguez's guilt because the information from the State Auditor was inconclusive about whether Rodriguez bought the ramps at an auction.

I did not adopt Rodriguez's seventh additional fact.

Though seizures occurred, they were based on probable cause. The existence of probable cause is fatal to Rodriguez's claim, but I still briefly analyze the malice element, and find that Rodriguez failed to show malice, for at least two reasons. First, Smith had probable cause to both

seek the warrants and testify before the grand jury, so there was no "illegitimate end." Said another way, Smith's actions were supported by the objective existence of probable cause, so his subjective intent was irrelevant.

Second, Rodriguez has not shown evidence of Smith's malicious intent. She repeats the same arguments from her response to the First MSJ (*compare* Doc. 55 at 13-17 *with* Doc. 82 at 24-26), all of which I considered in my First Order. Nevertheless, she emphasizes one circumstance "[o]f particular note" as "glaring evidence" of Smith's malice: "Defendant did not tell the grand jury that Garrison Martin had never named Andrew Miranda [as an accomplice] until AFTER Defendant discussed Miranda's affidavit with him." (Doc. 82 at 26 (emphasis retained).)

Yet Smith's grand jury testimony reveals that he provided the grand jury with an accurate timeline. Below is the pertinent excerpt. The assistant district attorney is asking the questions, and Smith is answering:

> Q. In regards to -- you mentioned Garrison Martin --
> A. Yes.
> Q. -- being one of the individuals --
> A. Correct.
> Q. -- you interviewed early on.
> A. Yeah, maintenance worker there.
> Q. [Inaudible]. Did he advise you, in fact, on January 6th of 2012 --
> A. Uh-huh.
> Q. -- how many ramps did he say Beverly Rodriguez took from the school district?
> A. From his recollection, three or four is what he thought that he saw. And then later I did a follow-up interview a couple weeks ago and how – "How did they leave the property?" ["]I saw them in the back of" -- I think it was Mr. Miranda, a good friend of hers, one of the affiants, pickup truck, heading that way, so --

(Smith Grand Jury Testimony Tr. 77:22-25, 78:1-15 (Doc. 56 at 20).) Two things in this testimony provide counter-evidence of malice. First, Smith noted that he obtained the

information about Miranda during a follow-up interview with Martin, which was sufficiently forthcoming. Second, Smith referred to Miranda as "one of the affiants"—an extra piece of information that weakened Smith's case, given that Miranda's affidavit states that Rodriguez proved she purchased the ramps at a school auction. I fail to see an intent to deceive the grand jury or illegitimately harm Rodriguez in this testimony.

Rodriguez has failed to establish two of the five elements of her Fourth Amendment malicious prosecution claim: element three—that Smith's actions were unsupported by probable cause—and element four—that Smith acted with malice. Rodriguez therefore did not carry the first part of her qualified immunity burden and establish a constitutional violation.

This finding, however, does not "[t]echnically" end the inquiry. *See Hawker v. Sand City Corp.*, 591 F. App'x 669, 672 n.5 (10th Cir. 2014) (unpublished) ("[C]ourts often mistakenly grant qualified immunity to officials when a plaintiff fails to satisfy his burden as to the first (violation) prong.") Applying the second prong, I find that the Fourth Amendment right to be free from malicious prosecution was clearly established in 2012, the year Smith obtained the warrants and arrested Rodriguez. At least one Tenth Circuit case put every reasonable officer on notice prior to 2012—*Wilkins*, decided in 2008.

In *Wilkins*, the two plaintiffs were arrested pursuant to arrest warrants and unsuccessfully prosecuted twice for murder. 528 F.3d at 793. They filed suit alleging that three officers violated their Fourteenth Amendment substantive due process rights—by coercing statements from witnesses—and their Fourth Amendment right to be free of malicious prosecution—by arresting them using arrest warrants based solely on falsified evidence obtained from the coercive interview techniques that lacked probable cause. *Id.* at 796. The court addressed only the Fourth Amendment malicious prosecution claim because the district court, on prior limited remand,

15

found the Fourteenth Amendment claim untimely. *Id.* The court held that "the allegation would state a Fourth Amendment violation sufficient to support a § 1983 malicious prosecution cause of action" and affirmed the denial of qualified immunity. *Id.* at 799. *Myers*, decided five years later, in 2013, summarized the *Wilkins* holding this way: "This Court said that where detention occurs after the institution of legal process, a plaintiff can claim that the legal process itself was wrongful, and thereby state a Fourth Amendment violation sufficient to support a § 1983 malicious prosecution cause of action." 738 F.3d at 1195 (quotation omitted).

In other words, Tenth Circuit precedent clearly established by at least 2008 that an officer violates a person's Fourth Amendment right to be free from malicious prosecution when he obtains and executes an arrest warrant based on falsified evidence. Rodriguez alleges the same factual circumstance in her First Amended Complaint. (*See* Doc. 69 at 19 ("Plaintiff had a Fourth Amendment right to be free from prosecution without probable cause. Defendant Smith initiated a wrongful criminal process by procuring an arrest warrant containing false and misleading information and which excluded significant exculpatory evidence.").)

Nevertheless, Smith is entitled to qualified immunity on Rodriguez's Fourth Amendment malicious prosecution claim because she failed to carry the first part of her two-part burden and establish a constitutional violation. *See Hawker*, 591 F. App'x at 672 n.5 ("Technicalities aside, the district judge properly granted summary judgment to [the officer] and the City as no Fourth Amendment violation occurred.").

## II.   Fourteenth Amendment Claim

The First Amended Complaint does not specify whether the Fourteenth Amendment claim arises under the substantive or procedural due process guarantee, or both. I assume the claim is one of a procedural due process violation because Rodriguez's statement of law in her

16

response relies entirely on Smith's statement of the law in his Second MSJ, which references only procedural due process. (*See* Doc. 82 at 26 ("Defendant's citation to the law is correct, and as such, Plaintiff will not repeat it here"); *see also* Doc. 77.)

Smith is entitled to summary judgment on this claim as well. Per *Myers* and Judge Gorsuch's concurrence in *Cordova*, New Mexico's state tort law provides Rodriguez with sufficient process to remedy Smith's allegedly unanticipated, illegal conduct. Rodriguez has not noted a deficiency in the state process, which means there is "just no reason to think a plaintiff might possibly be 'due' any more process than the State of New Mexico already provides." *Cordova*, 816 F.3d at 662 (Gorsuch, J., concurring). *Benavidez* provides additional support for this conclusion, and a recent District of New Mexico case relied on it to arrive at the same result. *See Winterhawk v. City of Farmington*, No. 1:15-cv-01074-PJK-LF, Doc. 28 at *3-4 (D.N.M. Feb. 16, 2016) (unpublished) (denying motion to dismiss as to Fourth Amendment claim arising from arrest pursuant to warrant affidavit allegedly omitting exculpatory information but granting motion as to Fourteenth Amendment claim).

Rodriguez has an adequate remedy in New Mexico state court, which means Smith is entitled to qualified immunity because Rodriguez is unable to establish a cognizable constitutional violation.

### III.     Request for Sanctions

In his reply, Smith argues that I should sanction Rodriguez because she acknowledged Smith's statement of law in his Second MSJ, which means Rodriguez "essentially concedes that she has an adequate remedy in state law." (Doc. 85 at 10.) Smith's argument somehow relies on *Myers* to condense Rodriguez's Fourth and Fourteenth Amendment claims into one Fourteenth

Amendment Claim. (*See* Doc. 77 at 16 ("Plaintiff's claim must be analyzed under the procedural component of the Fourteenth Amendment Due Process Clause").)

Yet *Myers* does not support the idea that Rodriguez's Fourth Amendment claim is somehow subsumed into her Fourteenth Amendment claim. Though *Myers* dealt with an accrual issue, it held that the plaintiff "properly stated a Fourth Amendment claim for malicious prosecution" in a nearly identical circumstance—an arrestee claiming that an officer "obtained an arrest warrant by fabricating facts to create the illusion of probable cause." 738 F.3d at 1192, 1195. Sanctions are inappropriate because Rodriguez's First Amended Complaint included a valid, free-standing Fourth Amendment claim, which Smith's state law remedy argument does not reach.

## CONCLUSION

Rodriguez is unable to carry the first part of her two-part qualified immunity burden and establish that Smith's actions violated her Fourth Amendment right to be free from malicious prosecution. Her Fourteenth Amendment claim for malicious prosecution likewise fails because she has an adequate remedy in New Mexico state court.

Smith's Second MSJ is granted. He is entitled to qualified immunity on Rodriguez's Fourth and Fourteenth Amendment malicious prosecution claims. This Order addresses the remaining claim in the First Amended Complaint and ends the case. The matter is dismissed with prejudice.

IT IS SO ORDERED.

                                                                                      */s/ William P. Lynch*
                                                                                       William P. Lynch
                                                                                       United States Magistrate Judge